JOURNAL ENTRY AND OPINION
{¶ 1} Defendant James Brady appeals from his convictions for two counts of rape and two counts of sexual battery. For the reasons set forth below, we affirm.
 {¶ 2} On April 30, 2004, defendant was indicted pursuant to a 24-Count indictment that accused him of sexually abusing his 42 year-old mentally retarded stepdaughter from May 2002 until November 2002. Counts One through Six charged defendant with rape and alleged that he purposely compelled her to submit by force or threat of force. Counts Seven through Twelve charged defendant with rape and alleged that defendant knew or had reasonable cause to believe that the woman's ability to resist or consent was substantially impaired due to a mental or physical condition. Counts Thirteen through Eighteen charged defendant with sexual battery and alleged that defendant engaged in sexual conduct with the *Page 2 
woman knowing that her ability to appraise the nature of or control of her conduct was substantially impaired. Counts Nineteen through Twenty-Four charged defendant with sexual battery and alleged that defendant engaged in sexual conduct with the woman and that he is her adoptive parent and/or stepparent.
 {¶ 3} Defendant pled not guilty and the matter proceeded to a jury trial on July 26, 2005.
 {¶ 4} The state presented the testimony of the woman, R.B.,[1] who was born in 1961. In 2002, when she still resided with her mother and her stepfather, defendant, R.B. worked on a maintenance crew at Frommer ATC and her boss was Nate Hart. She generally took a cab to work, and worked from 1:00 p.m. until 7:00 p.m.
 {¶ 5} The woman testified that her mother left early in the morning to go to work and defendant would generally wake her up. When she was getting out of the bathtub, and was getting dressed, defendant approached her. He was wearing just a snap robe and told her that she had time and did not have to get dressed. The woman told defendant that she did not want to have sex but he took off his towel then kissed her vagina then inserted his penis into her. She testified that defendant has a big penis. The woman further testified that some "white stuff came out" and she became scared. She took a shower to try to get the white stuff off of her then *Page 3 
told defendant to go into his bedroom so she could get ready for work. Defendant told the woman that this would make her feel good to go to work and would calm her down.
 {¶ 6} The woman also testified to another incident when defendant had her kiss his penis and told her it would make him feel good. She testified that a liquid came out of his penis. R.B. stated that the white stuff tasted yucky so she spit it out in the toilet, but some was around his penis and on the sheets.
 {¶ 7} The woman testified that she tried to talk to Nate Hart about what had happened but felt uncomfortable and asked him if she could speak with a female. She then spoke to Lisa Gessler and reported that defendant put his penis inside of her. The woman had difficulty remembering but stated that defendant put his penis in her twice.
 {¶ 8} On cross-examination, the woman acknowledged that she had sent her father cards. She also admitted that she saw her doctor in September 2002 but did not tell her of any abuse. The woman stated that she watches soap operas and that shortly before her disclosure to Gessler she had watched a movie about a woman who accused someone of rape. She also stated that she had taken a class on sex education in which she had learned the words penis and vagina. She stated on redirect examination, however, that she knew the difference between the truth and a lie and that she had told the truth.
 {¶ 9} Nathaniel Hart testified that he works for the Cuyahoga County *Page 4 
Department of Mental Retardation and that he supervises a cleaning crew which included R.B. Hart testified that the woman appeared to enjoy her job and talked to the other workers but by the summer of 2002, she had "an attitude" and began protesting her job assignments. The woman became fearful and cried when it was time to go home but she did not allow Hart to call her parents. She yelled and rocked while Hart drove the workers home. She told Hart that she did not want to go home but would not tell him the reason.
 {¶ 10} Hart informed his supervisor, Jim Cable, of the woman's behavior and Cable arranged for her to have a consultation in the psychiatric department. Since making the disclosure, the woman has lost a lot of weight, is tearful, and has panic attacks. She sometimes lies then quickly recants her lies.
 {¶ 11} Jim Cable testified that Hart is one of his best employees. He further testified that R.B. functions at the level of a younger adolescent, i.e., in the range of a thirteen or fourteen year-old.
 {¶ 12} R.B.'s general demeanor was friendly, bubbly and pleasant. Cable later learned that R.B. was upset, so he spoke with her. She became teary-eyed but would not talk. Cable asked if she wanted to speak with a female and she replied that she did. The next day, R.B. spoke to psychologist Lisa Gessler and Gable found an emergency placement for her. Since this time, the woman's demeanor is now bitter and sad and she is difficult to work with.
 {¶ 13} Lisa Gessler testified that the woman was crying heavily when they met *Page 5 
so Gessler gave her gum in an effort to stop her from sobbing. The woman told Gessler that her father touches her "down below" and that she tells him "no." R.B. then related an incident which occurred near the shower. She also told Gessler that she was worried about being pregnant because defendant does not use a condom. She further stated that defendant "does it hard" and she keeps getting infections. The woman was unsure of the time of such conduct but stated that it started after defendant had surgery on his arm. The abuse occurred in the mornings and the last incident occurred on a Monday. Gessler related the woman's allegations to Jeff Starr of the Major Unusual Incident Department. On cross-examination, Gessler admitted that a report prepared by her supervisor indicates that one of R.B.'s goals was to live independently.
 {¶ 14} Investigator Jeff Starr testified that he met with Cable, Gessler and R.B. He then transported her to the Emergency Room at Southwest Hospital where they were met by North Royalton Police Officer Rybicki and later by Dr. Debra Russell.
 {¶ 15} The woman indicated that she did not want to go home and Starr arranged for her to go to respite care. According to Starr, the woman was sad, crying, and afraid that her parents were going to be upset with her.
 {¶ 16} Officer Rybicki testified that she stayed with the woman in the examination room. The woman was crying, shaking and would not let Rybicki leave.
 {¶ 17} On cross-examination, Rybicki testified that she inventoried various *Page 6 
items when a search warrant was conducted at defendant's home.
 {¶ 18} Dr. Debra Russell testified that she examined the woman on November 6, 2002. The woman was upset and anxious and informed Russell that two days earlier, defendant put his private into her private. She asked him to stop and pushed his face away but he did not stop. She also stated that there were several other times during which defendant made her kiss his penis and other times during which he had kissed her genitals. The woman stated that defendant told her that he wanted to make her feel good before she went to work, and the woman kept repeating that she did not know why a father would do this to his daughter. Dr. Russell asked the woman if she knew what a condom is and she stated that she does and that defendant did not use condoms during sex. The woman indicated in response to questioning that defendant hurt her "down there" but did not hit her.
 {¶ 19} Dr. Russell further testified that the woman told her that when defendant makes her kiss his penis, white stuff comes out and she does not like the way it tastes so she spits it out into the sink. Dr. Russell next learned that R.B. had brushed her teeth, showered, and washed her clothes since the incidents. Dr. Russell asked the woman why she had not told her mother about the incidents and the woman became upset and anxious. She expressed fear that her mother would get mad at her and would think that she is just making things up.
 {¶ 20} Dr. Russell conducted a physical examination of the woman and noted that the woman had tenderness and mild swelling of the vagina and vaginal walls. *Page 7 
There was no infection. There was tenderness, redness and inflammation of the cervix, or area beyond the vagina. According to Dr. Russell, redness and swelling of the vaginal area are indicative of injury to the tissues.
 {¶ 21} On cross-examination, Dr. Russell stated that the findings could be caused by masturbation only if the person masturbates to the point of hurting herself and were not consistent with frequent masturbation. She also indicated that the finding of tenderness was based on the woman's complaints but the inflammation was from some form of trauma.
 {¶ 22} North Royalton Police Det. James Gross testified that he met with Officer Rybicki and Jeff Starr and obtained a search warrant for defendant's home. The officers removed various items of clothing and bedding and then interviewed defendant. Defendant told the officers that he adopted R.B. and her brother and that he and R.B.'s mother have two biological children together. Defendant told the police that R.B. functions at the level of a twelve year-old and that she is friendly with strangers and hyperactive. Defendant stated that the officers would find no physical evidence of any sexual assault and that he believed that Nathaniel Hart was somehow behind the allegations. Defendant admitted to Det. Gross, however, that he is responsible for waking R.B. after his wife goes to work, and that R.B. has seen him naked.
 {¶ 23} No evidence was recovered from the items taken pursuant to the search warrant. *Page 8 
 {¶ 24} At the close of the state's case, defendant's trial counsel moved to dismiss counts Two through Six, Eight through Twelve, Fourteen through Eighteen, and Twenty through Twenty-Four. The trial court denied the motion and defendant elected to present evidence.
 {¶ 25} Diane Royle testified that she has known defendant and his wife since approximately 1970 and she sees the family at least once per month. Royle indicated that R.B.'s demeanor did not change at all in the time period from May 2002 until November 2002 and that she has never shown any signs of being afraid of defendant. Royle also testified that R.B.'s mother is protective of her and defendant is a gentleman. She stated that R.B. functions at the preteen level but tries to do the things that her sisters do and that she has been known to stretch the truth.
 {¶ 26} Mary Rose Palfy, a direct care worker who has provided care for R.B. from September 2003 until December 2004, testified that R.B. would indicate that she had showered when she had not. R.B.'s mother visited her weekly and brought snacks for her. According to Palfy, R.B. would sometimes think that a male was looking at her and sometimes talked about getting her own place to live.
 {¶ 27} On cross-examination, Palfy admitted that R.B. had not seen her nieces and nephews since making the allegations at issue and that she misses them.
 {¶ 28} Michelle Schoenhofer testified that she provided respite care to R.B. and that R.B. lies, made comments about Schoenhofer's husband's body, and had once stared at his crotch. *Page 9 
 {¶ 29} Jean Brady, defendant's sister, testified that defendant is very patient with R.B. and taught her how to perform many household chores. She further testified that R.B. tells stories, has always wanted to have her own place to live, and is flirtatious with men.
 {¶ 30} Heather Ginley, defendant's daughter, testified that the family included R.B. in its activities and also supported her participation in the Special Olympics and other activities for mentally retarded people. According to Ginley, R.B. has gotten increasingly difficult to be around and is frustrated at not doing the things that other family members can do. She is extremely flirtatious around men and frequently gives out her phone number and address to strangers.
 {¶ 31} Ginley further testified that defendant had surgery on his arm in April 2002 which left him weak. In July of 2002, after Ginley's daughter was born, she came over every morning for two weeks. In addition, Ginley frequently stops at her parents' home. In November 2002, Ginley and R.B. watched a movie about a girl who learned about sexual abuse at school then reported that her father had abused her.
 {¶ 32} On cross-examination, Ginley admitted that she had limited contact with R.B. immediately following the reporting of the allegations and that she has not let R.B. see her children since that time.
 {¶ 33} Dawn Connor, defendant's daughter, testified that R.B. has a hard time telling the truth, wants to be independent and touches herself inappropriately in *Page 10 
public. Connor asserted that defendant has had to wear an arm brace since his surgery and uses a device to keep it from swelling. Connor further testified that her children stay at defendant's home. She admitted that she has not spoken to R.B. since her report of rape and no longer allows R.B. in her home.
 {¶ 34} Marge Brady, defendant's wife, testified that the family's lives were centered around R.B. and that defendant has been an extremely good father to her. Since being separated from her family, R.B. continues to ask about defendant.
 {¶ 35} Marge Brady also testified that R.B. has difficulty telling the truth, is inappropriate around boys and wants to be independent. R.B. had a lot of problems with yeast infections and frequently scratched her vaginal area in public and also masturbated in her bedroom. Mrs. Brady also stated that R.B. is physically strong, strong-willed and cannot be made to do something she does not want to do. She is also extremely fearful of doctors.
 {¶ 36} With regard to the items taken pursuant to the search warrant, Mrs. Brady stated that warrant was executed on a Wednesday and that the laundry was usually done on Fridays.
 {¶ 37} Defendant testified on his own behalf and stated that he and his wife were always attentive to R.B.'s grooming. The woman caused them to worry following one incident when she was observed playing "grab ass" at a dance and another when she came home late. According to defendant, the woman had a boyfriend named Bobby for about fifteen years. *Page 11 
 {¶ 38} Defendant admitted that he and the woman are alone in the mornings and that he is responsible for waking her up to get ready for work, but he asserted that the doors to the home are never locked and that friends frequently enter the home unannounced.
 {¶ 39} Defendant further testified that in May 2002, he had surgery for skin cancer in May 2002. Following the surgery, he had a drainage tube in his arm and wore a sling. At this time, R.B. helped him with his shoes and socks.
 {¶ 40} Defendant further testified that on the Monday before R.B. made the claim that she had been raped, he went to his sister's house at 9:30 a.m. R.B. was still asleep so he called her on the phone to wake her. He denied that he was with the woman and denied that they engaged in sexual conduct. That Wednesday, he put summer clothes and luggage in the attic and R.B. helped him. R.B. then went to work. Defendant and his wife went to a bar with friends later that night and became concerned when R.B. did not call them to say that she had arrived home. They then learned that the woman had been placed in respite care. When the police subsequently executed a search warrant at their home, defendant indicated that if the woman had been raped, Nate Hart may have been the assailant.
 {¶ 41} Defendant stated that the woman functions at the level of a thirteen year-old and he did not believe that she understood the nature of the charges. He opined that perhaps the woman raised the allegations in order to live on her own.
 {¶ 42} On cross-examination he acknowledged that he told police that Hart *Page 12 
probably talked the woman into making the allegations.
 {¶ 43} Annette Byers, a house manager for Anthony Wayne Services, testified on rebuttal that R.B. fibs about hygiene issues but this is not uncommon when dealing with mentally retarded people. R.B. comments about boys but her remarks are innocent. She misses her family and did not have much contact with her mother while in respite care.
 {¶ 44} The jury subsequently convicted defendant of the first count of each category of offenses, i.e., Counts One, Seven, Thirteen and Nineteen. The jury was hung as to the next three counts in each category (i.e., Counts Two, Three, Four, Eight, Nine, Ten, Fourteen, Fifteen, Sixteen, Twenty, Twenty-One and Twenty-Two), and defendant was acquitted of the remaining two counts in each category (i.e., Counts Five, Six, Eleven, Twelve, Seventeen, Eighteen, Twenty-Three and Twenty-Four). The trial court subsequently merged defendant's convictions on Counts One and Seven for purposes of sentencing, and sentenced him to three years of imprisonment for these offenses. The court also merged defendant's convictions on Counts Thirteen and Nineteen for purposes of sentencing and sentenced him to one year of imprisonment for these offenses, to run concurrent to the three-year term. In addition, the court determined that he is a sexually oriented offender. Defendant now appeals and assigns seventeen errors for our review.
 {¶ 45} Defendant's first assignment of error states:
 {¶ 46} "Mr. Brady was denied a speedy trial in violation of his right to a speedy *Page 13 
trial under the Ohio Revised Code, the Ohio Constitution, and the Sixth
and Fourteenth Amendments to the United States Constitution."
 {¶ 47} Within this assignment of error, defendant asserts that his statutory right to a speedy trial was violated because he was not tried within 270 days of his arrest on November 7, 2003.
 {¶ 48} In State v. Azbell, 112 Ohio St.3d 300, 2006-Ohio-6552,859 N.E.2d 532, the Supreme Court determined that for purposes of calculating speedy-trial time pursuant to R.C. 2945.71(C), a charge is not pending until the accused has been formally charged by a criminal complaint or indictment, is held pending the filing of charges, or is released on bail or recognizance.
 {¶ 49} In this matter, the defendant was arrested then released and no formal charges were filed until his indictment on April 30, 2004. Defendant was then released on bond following his arraignment on May 12, 2004. Accordingly, speedy trial did not begin to run at the time of defendant's arrest.
 {¶ 50} Thereafter, defendant requested seventeen continuances of the matter and also waived speedy trial time from May 15, 2005 until August 31, 2005. The case proceeded to trial within the statutory limit.
 {¶ 51} This assignment of error is therefore without merit.
 {¶ 52} Defendant's second and third assignments of error are interrelated and state:
 {¶ 53} "The trial court plainly erred when it provided the jurors with the wrong *Page 14 
definition of "force," an essential element of the crime of rape as alleged in Count One."
 {¶ 54} "There was insufficient evidence of `force' to sustain the conviction in Count One."
 {¶ 55} In this case, the trial court instructed the jury as follows:
 {¶ 56} "Force means any violence, compulsion or constraint physically exerted by any means upon or against a person or thing.
 {¶ 57} "When the relationship between the victim and the defendant is one of child and parent, the element of force need not be openly displayed or physical. It can be subtle or slight and psychological or emotionally powerful. Evidence of an expressed threat of harm or evidence of significant physical restraint is not required. If you find beyond a reasonable doubt that the victim's will was overcome by fear or duress or intimidation, the element of force has been proved." (Tr. 631-632).
 {¶ 58} As an initial matter, we note that defendant did not object to this charge. Accordingly, it will be reviewed for plain error. See Crim.R. 52; State v. Long (1978), 53 Ohio St.2d 91, 94, 372 N.E.2d 804. An erroneous jury instruction does not constitute plain error unless, but for the error, the outcome of the trial clearly would have been otherwise. State v. Cooperrider (1983), 4 Ohio St.3d 226, 227,448 N.E.2d 452.
 {¶ 59} We further note that "[f]orce need not be overt and physically brutal, but can be subtle and psychological. As long as it can be shown that the rape victim's *Page 15 
will was overcome by fear or duress, the forcible element of rape can be established." State v. Fowler (1985), 27 Ohio App.3d 149,500 N.E.2d 390.
 {¶ 60} Moreover, "the force and violence necessary to commit the crime of rape depends upon the age, size and strength of the parties and their relation to each other. With the filial obligation of obedience to a parent, the same degree of force and violence may not be required upon a person of tender years, as would be required were the parties more nearly equal in age, size and strength." State v. Eskridge (1988),38 Ohio St.3d 56, 526 N.E.2d 304.
 {¶ 61} Defendant insists that this rule is inapposite here because R.B. was forty-two at the time of the events at issue and, he claims, there was no evidence of threat, coercion, violence, compulsion or constraint.
 {¶ 62} Defendant relies upon State v. Schaim, 65 Ohio St.3d 51,1992-Ohio-31, in which the Supreme Court held that a threat of force can be inferred from the circumstances surrounding sexual conduct, but a pattern of incest will not substitute for the element of force where the state introduces no evidence that an adult victim believed that the defendant might use physical force against her. The Court refused to apply the position of authority rule in such case, because the victim was an adult at the time of the charged rape and a pattern of incest was offered in place of evidence of force.
 {¶ 63} We find the rule of Eskridge applicable however, as R.B. is mentally retarded and functions at approximately the thirteen or fourteen year-old level, she *Page 16 
lived with defendant and defendant was in a position of authority over her. We therefore reject this assignment of error. Accord State v.Maim (December 30, 1998), Lorain App. 97CA006898.
 {¶ 64} As to the sufficiency of the evidence of force, R.B. testified that defendant approached her as she was getting dressed and told her that she had time and did not have to get dressed. The woman told defendant that she did not want to have sex but he took off his towel then kissed her vagina then inserted his penis into her. She also told Dr. Russell that defendant made her kiss his private part and that she tells him "not to" but he makes her do it to feel good about going to work. The evidence further indicated that the woman functions at the level of a youngster, that she lived with defendant and that he had parental authority over her. We therefore conclude that any rational factfinder, after viewing the evidence in a light most favorable to the state, could have found the essential element of force proven beyond a reasonable doubt. State v. Thompkins, 78 Ohio St. 3d 380, 387,1997 Ohio 52, 678 N.E.2d 541. The third assignment of error is therefore overruled.
 {¶ 65} Defendant's fourth assignment of error states:
 {¶ 66} "The conviction for rape as alleged in Count One was against the manifest weight of the evidence."
 {¶ 67} "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.' It indicates clearly to the jury that the party having the burden of proof will *Page 17 
be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."
 {¶ 68} State v. Thompkins, 78 Ohio St.3d 380, 390, 1997 Ohio 52,678 N.E.2d 541.
 {¶ 69} In reviewing a claim that a conviction is against the manifest weight of the evidence, a reviewing court cannot reverse a conviction unless it is obvious that the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Garrow (1995),103 Ohio App.3d 368, 370-371, 659 N.E.2d 814. Further, this court must remain mindful that the weight of the evidence and the credibility of witnesses are matters primarily for the trier of fact. State v. Bruno, Cuyahoga App. No. 84883, 2005-Ohio-1862.
 {¶ 70} In this matter, R.B.'s description of the crimes contained detailed descriptions of sexual conduct. The woman's testimony that defendant has a big penis and the description of her experience after defendant ejaculated was compelling evidence. The evidence also indicated that the woman told defendant "no" and "not to," that he did it anyway and hurt her "down there" and that he made her do it to feel good about going to work.
 {¶ 71} Moreover, this evidence was consistent with the evidence of the *Page 18 
woman's marked change in attitude following those crimes, the evidence that defendant was responsible for waking the woman, and the medical evidence showing tenderness and mild swelling of the vagina and vaginal walls, tenderness, redness and inflammation of the cervix, without infection (thus ruling out the yeast infection theory). Although the defense insisted that the woman fabricated the story, defendant admitted that the woman had seen him naked, and also attempted to shift culpability to Hart.
 {¶ 72} The defense also presented evidence that the woman has lied, but on balance, this evidence went to matters of hygiene or trivial matters and was generally followed by a quick recantation. In addition the evidence indicated that such statements are not uncommon when dealing with the mentally retarded. We therefore cannot conclude that the jury lost its way and created a manifest miscarriage of justice in convicting defendant of rape. This assignment of error is without merit.
 {¶ 73} Defendant's fifth and seventh assignments of error are interrelated and state:
 {¶ 74} "There was insufficient evidence that [R.B.'s] ability to resist or consent to sexual conduct was substantially impaired because of a mental or physical condition, thus causing the evidence relating to Count Seven to be insufficient as a matter of law."
 {¶ 75} "There was insufficient evidence that [R.B.'s] ability to appraise the *Page 19 
nature of or control her conduct was substantially impaired, thus causing the evidence relating to Count Thirteen to be insufficient as a matter of law."
 {¶ 76} Within these assignment of error, defendant claims that the woman functions above the level at or above a thirteen year-old. He notes that this is the age at which the law determines that one is able to consent to sexual conduct and notes that the woman has had jobs. He therefore claims that there is insufficient evidence that her ability to resist was impaired due to her mental retardation.
 {¶ 77} R.C. 2907.03(A)(2) provides that "no person shall engage in sexual conduct with another, not the spouse of the offender, when * * * the offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired."
 {¶ 78} The relevant question is whether the woman's ability to appraise the nature of her conduct was diminished. R.C.2907.02(A)(1)(c); R.C. 2907.03; State v. Ferguson (May 25, 200), Franklin App. No. 99AP-819. Substantial impairment does not have to be proven by expert medical testimony; rather, it can be shown to exist by the testimony of people who have interacted with the victim, and by allowing the trier of fact to do its own assessment of the person's ability to appraise or control his or her conduct. State v.Robinson, Summit App. No. 21317, 2003-Ohio-5360; 2003 State v.Hillock, Harrison App. No. 02-538-CA, 2002-Ohio-6897; State v. Tate
(Oct. 26, 2000), Cuyahoga App. No. 77462.
 {¶ 79} In this matter the jury was able to assess R.B.'s ability to appraise or *Page 20 
control her conduct. In addition, the state's evidence demonstrated that the woman functions at the level of a thirteen or fourteen year-old. Defendant's witness Royle opined that she functioned at the preteen level. It is undisputed that the woman could never drive, cook, manage money or live independently. This evidence was sufficient to enable reasonable minds to reach different conclusions as to whether her ability to appraise the nature of or control her conduct was substantially impaired. Accord State v. Novak, Lake App. No. 2003-L-077,2005-Ohio-563; State v. Bohannon (Mar. 15, 1989), Hamilton App. No. C-880004; State v. Joseph (July 24, 1985), Hamilton App. No. C-840751;State v. Bienkowski (Nov. 23, 1983), Cuyahoga App. No. 46795; In reSechler (Aug. 29, 1997), Trumbull App. No. 96-T-5575.
 {¶ 80} These assignments of error are without merit.
 {¶ 81} Defendant's sixth assignment of error states:
 {¶ 82} "The conviction in Count Seven is against the manifest weight of the evidence."
 {¶ 83} Defendant next claims that his conviction for rape of a substantially impaired person is against the manifest weight of the evidence. As we have already noted, the relevant question is whether the woman's ability to appraise the nature of her conduct was diminished. R.C. 2907.02(A)(1)(c). The undisputed evidence demonstrated that the woman is mentally retarded, functions at the level of a preteen or young teen, cannot drive, manage money or live independently. The evidence *Page 21 
further indicated that defendant was well aware of the woman's limitations, as he purchased a home in a gated community due to concerns for the girl and he determined that she could never drive.
 {¶ 84} As also noted previously, defendant had authority over the girl and was responsible for waking her in the morning and having her get dressed. Further, R.B. provided a detailed description of the crimes, testimony that defendant has a big penis and the description of her experience after defendant ejaculated constituted compelling evidence. This evidence was consistent with the evidence of the woman's marked change in attitude following those crimes and the medical evidence. Defendant asserted that the woman fabricated the story for independence but he admitted that she had seen him naked, and he also attempted to shift culpability to Hart. Her prior lapses of credibility generally went to trivial matters and, the evidence showed, were consistent with her disabilities. Moreover defendant claimed that the woman did not understand the nature of the charges she had made. Finally, his claim that the allegations were motivated by the woman's desire for independence cannot be reconciled with her continuing sadness at being separated from family members.
 {¶ 85} We therefore cannot conclude that the jury lost its way and created a manifest miscarriage of justice in convicting defendant of the offense.
 {¶ 86} This assignment of error is therefore without merit.
 {¶ 87} Defendant's eighth assignment of error states: *Page 22 
 {¶ 88} "The conviction for Count Thirteen is against the manifest weight of the evidence."
 {¶ 89} In this matter, the evidence indicated that the woman was mentally retarded, functioned at the level of a young teen but could never live independently, and would never be able to do many things. The evidence further demonstrated that defendant was aware of the woman's limitations and defendant opined that the woman did not even know the nature of the allegations she had made. The evidence also indicated that the woman told defendant "no" and "not to," and that he made her kiss his part and made her do it to feel good about going to work. The evidence further demonstrated that "white stuff came out. The woman testified that it tasted yucky so she spit it into the sink. The defendant admitted that the woman had seen him naked and indicated that the woman had thorough sex education. The woman's testimony was not sophisticated as if from education, however, but instead suggested detail from inappropriate experience. The defense also suggested that the woman had fabricated the charges in order to achieve independence but this contention is at odds with the regard which the woman has for her family and her sadness at being separated from them. Viewing the record as a whole we cannot say that the jury lost its way and created a manifest miscarriage of justice in convicting defendant of sexual battery. This claim is without merit.
 {¶ 90} Defendant's ninth assignment of error states:
 {¶ 91} "The trial court denied Mr. Brady due process of law under the *Page 23 Fourteenth Amendment when it failed to order the alleged victim be subjected to a mental examination then allowed the state to introduce evidence of the victim's mental health and development from professional caregivers."
 {¶ 92} In State v. Zeh (1987), 31 Ohio St.3d 99, 509 N.E.2d 414, syllabus, the Supreme Court held:
 {¶ 93} "1. Generally, a prosecution witness for the state has the right to refuse an extra-judicial, pre-trial interview, deposition, or examination by an agent of the defendant.
 {¶ 94} "2. When the mental condition of the victim-potential witness is a contested, essential element of the crime charged, the defense may move the court that the state be barred from utilizing evidence of such mental condition obtained in a clinical interview of the witness prior to trial, unless such witness voluntarily agrees to a court-appointed, independent examination with the results being made available to both sides."
 {¶ 95} Defendant concedes that the state did not offer into evidence the results of any clinical interview conducted on the victim. Nevertheless, he complains that the state put into evidence the testimony of mental health professionals who dealt with the victim, and that their testimony had the effect of vouching for her mental condition without giving him an independent opportunity to do the same. We do not agree with the characterization of these witnesses as expert witnesses. Rather, they were fact witnesses who testified regarding their role in dealing with the woman after *Page 24 
she became upset about going home.
 {¶ 96} Moreover, the defendant offered testimony that the woman had limited functioning. He noted her immaturity and inability to care for herself. That conclusion would have been self-evident from having lived and been raised with the victim for over 30 years.
 {¶ 97} This claim is therefore without merit.
 {¶ 98} Defendant's tenth assignment of error states:
 {¶ 99} "The conviction for sexual battery as alleged in Count Nineteen is against the manifest weight of the evidence."
 {¶ 100} Pursuant to R.C. 2907.03(A), "No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply: * * *
 {¶ 101} "(5) The offender is the other person's natural or adoptive parent, or a stepparent, or guardian, custodian, or person in loco parentis of the other person."
 {¶ 102} In this case, the undisputed evidence demonstrated both that defendant married R.B.'s mother when R.B. was a young girl, then later adopted R.B. In addition, the state presented evidence that defendant engaged in sexual conduct with the woman and there were signs of physical injury. The defense asserted that the woman lied, and was motivated to attain independence. This was inconsistent with the unrefuted evidence that the woman continues to require *Page 25 
constant care and misses her family members. The defense also maintained that the woman had thorough sex education but her testimony was focused on her experience and lacked sophistication. Accordingly, we cannot conclude that the jury lost its way in accepting the evidence offered by the state and convicting defendant of the offense of sexual battery pursuant to R.C. 2907.03(A)(5).
 {¶ 103} This claim therefore lacks merit.
 {¶ 104} Defendant's eleventh assignment of error states:
 {¶ 105} "The trial court erred when it refused to allow the defense to impeach [R.B.'s] credibility with evidence of prior lies and fabrications relating to sexual conduct."
 {¶ 106} In State v. Boggs (1992), 63 Ohio St.3d 418, 422,588 N.E.2d 813, supra, the court stated:
 {¶ 107} "False accusations, where no sexual activity is involved, do not fall within the rape shield statute. Therefore, a defendant is permitted under Evid.R. 608(B), in the court's discretion, to cross-examine the victim regarding such accusations if `clearly probative of truthfulness or untruthfulness.' However, the defendant will be bound by the answers given by the victim. * * * The mere fact that an alleged rape victim made prior false allegations does not automatically mean that she is fabricating the present charge. Likewise, prior false allegations of sexual assault do not tend to prove or disprove any of the elements of rape, nor do they relate to issues of consent. Hence, they are an entirely collateral matter which may *Page 26 
not be proved by extrinsic evidence."
 {¶ 108} Moreover, when the defense seeks to cross-examine on prior false accusations of rape, the burden is upon the defense to demonstrate that the accusations were totally false and unfounded. Id. If the trial court determines that the allegations were made and were in fact false, the court still has discretion to prohibit a defendant from posing any further questions on the matter. Id.
 {¶ 109} In this matter, the defense sought records from the Board of Mental retardation and Developmental Disabilities Group, in order to determine whether R.B. had made false allegations of any other sexual offense. The trial court reviewed the records in camera and "found that there were no allegations of any rape or other sexual assault within the records." (Tr. 4). The defense also claimed that Mrs. Shoenhofer "apprised MRDD that [R.B.] had mentioned to her that one of the males in a respite care home had molested her and apparently MRDD felt the allegation was so unwarranted they didn't even pursue an investigation. Therefore it was not reduced to paper."
 {¶ 110} We find no abuse of discretion. The evidence was totally speculative as to whether this accusation was made, and if made, whether it was actually false and unfounded. In light of the absence of records from the Board of Mental Retardation, a mandatory reporter for abuse,[2] and the absence of any other *Page 27 
evidence from those to whom this claim was supposedly presented, the defense did not meet its burden of showing that R.B. made prior allegations of sexual abuse or that they were false and unfounded. Accord State v. Delozier (November 17, 1994), Franklin App. No. 94APA02-250.
 {¶ 111} Defendant also wished to elicit evidence that R.B. fabricated that she was pregnant and had an ultrasound. We again find no abuse of discretion as the court permitted the defense to elicit that the woman untruthfully told co-workers that she had a medical procedure, and this ruling was made in light of the rape shield protections. (Tr. 284-285). See State v. Miller (1989), 63 Ohio App.3d 479, 579 N.E.2d 276.
 {¶ 112} This assignment of error is therefore without merit.
 {¶ 113} Defendant's twelfth assignment of error states:
 {¶ 114} "The trial court erred when it refused to allow the defense to introduce evidence of Mr. Brady's good character."
 {¶ 115} Defendant next claims that the trial court erred in refusing to permit him to introduce evidence that he did not have "deviant" tendencies.
 {¶ 116} Pursuant to R.C. 2907.02(D),
 {¶ 117} "Evidence of specific instances of the defendant's sexual activity, opinion evidence of the defendant's sexual activity, and reputation evidence of the defendant's sexual activity shall not be admitted under this section unless it involves evidence of the origin of semen, pregnancy, or disease, the defendant's past sexual *Page 28 
activity with the victim, or is admissible against the defendant under [R.C. 2945.59], and only to the extent that the court finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value."
 {¶ 118} In accordance with the foregoing, we find no abuse of discretion in connection with the trial court's ruling. State v.Banks (1997), 117 Ohio App.3d 592, 690 N.E.2d 1362.
 {¶ 119} Defendant's thirteenth assignment of error states:
 {¶ 120} "The trial court plainly erred when it permitted the introduction of hearsay evidence regarding allegations of sexual conduct made out-of-court by [R.B.]"
 {¶ 121} Within this assignment of error, defendant complains that Lisa Gessler and Dr. Russell provided inadmissible hearsay evidence and violated his right to confrontation pursuant to Crawford v.Washington (2004), 541 U.S. 36, 68,124 S. Ct. 1354, 158 L. Ed 2d 177, when they testified to R.B.'s out-of-court statements regarding acts of sexual conduct.
 {¶ 122} The Sixth Amendment's Confrontation Clause provides that, "in all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him."
 {¶ 123} In Crawford v. Washington, supra, the Supreme Court of the United States held that out-of-court statements that are testimonial are barred, under *Page 29 
the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness, regardless of whether the statements are deemed reliable by the trial court. The Court defined these "testimonial" statements to include "ex parte in-court testimony or its functional equivalent — that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used "prosecutorially" and "extrajudicial statements * * * contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," and "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."541 U.S. at 51-52. (Emphasis added).
 {¶ 124} Thus as to "testimonial evidence," "the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." 541 U.S. at 68, 124 S.Ct. at 1374.
 {¶ 125} "Where nontestimonial hearsay is at issue," however, the Court found it "wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law — as does[Ohio v.] Roberts [448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed. 2d 597], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." 541 U.S. at 68.
 {¶ 126} Accordingly, the Court held that with nontestimonial hearsay, the *Page 30 Ohio v. Roberts (1980), 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed. 2d 597, reliability test still applies. See, e.g., State v. Muttart, Hancock App. No. 5-05-08, 2006-Ohio-2506.
 {¶ 127} Under the Roberts standard the Sixth Amendment right to confrontation does not bar the admission of a witness' statement against a criminal defendant if the statement bears "adequate `indicia of reliability.'" Id. at 66. The Roberts test is met when the evidence either falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." Id.
 {¶ 128} In the recent case of State v. Stahl, 111 Ohio St. 3d 186;2006-Ohio-5482; 855 N.E.2d 834, the Supreme Court held that where the rape victim made a statement to police, then subsequently presents herself for a medical examination for purposes of gathering evidence of the crime and repeats the identification, the statement to medical personnel is not testimonial and may be admitted into evidence.
1. Statements to Dr. Russell
 {¶ 129} In this matter, the statements to Dr. Russel occurred when R.B. was brought for a medical evaluation after she reported that she had been abused. Dr. Russell testified that she examined the woman to determine whether she had been injured. The woman's statements were made for medical or psychological purposes. Accord State v. Grimes, Cuyahoga App. No. 87037, 2006-Ohio-4262. See, also, State v. Lee, Summit App. No. 22262, 2005-Ohio-996 (finding there is no reason for a rape victim to believe that when she reiterates statements to a sexual *Page 31 
assault nurse, they will be used for anything other than treatment). There is no indication that the woman had reason to believe that the statements would be used for anything other than medical treatment. In short, the woman's statements were not testimonial and were properly admitted into evidence.
2. Statements to Gessler
 {¶ 130} The holding in Crawford does not preclude the use of excited utterances; rather, it limits the use of testimonial statements.State v. Leide, Butler App. No. CA2005-08-363, 2006-Ohio-2716; State v.Florence, Montgomery App. No. 20439, 2005-Ohio-4508, see, also,Akron v. Hutton, Summit App. No. 22425, 2005-Ohio-3300; State v.Muttart, supra.
 {¶ 131} Evidence Rule 803(2) provides:
 {¶ 132} "The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
 {¶ 133} "(2) Excited utterance
 {¶ 134} "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."
 {¶ 135} In this matter, R.B.'s statement to Gessler related to the startling event which R.B. said she experienced near the shower. In speaking with Gessler, R.B. was crying so hard that Gessler gave her gum to stop her from sobbing and she therefore remained under the stress of the event. The evidence also indicated that the last abusive incident occurred two days earlier. In accordance with the *Page 32 
foregoing, the statement constituted an excited utterance and the trial court did not err in permitting admission of this evidence. Cf.State v. Duncan (1978), 53 Ohio St.2d 215, 373 N.E.2d 1234.
 {¶ 136} The assignment of error is without merit.
 {¶ 137} Defendant's fourteenth assignment of error states:
 {¶ 138} "The convictions for Counts One, [Seven] Thirteen and Nineteen must be reversed because it is impossible to determine if Mr. Brady was convicted of the same crimes for which he was indicted [and] it is impossible for him to challenge his convictions on appeal."
 {¶ 139} To the extent that appellant argues the indictment was defective, he waived that argument by failing to raise it before trial. See Crim.R. 12(C)(2); State v. Hardy, Cuyahoga App. No. 82620,2004-Ohio-56; State v. Blalock, Cuyahoga App. Nos. 80419 and 80420, 2002-Ohio-4580, P75.
 {¶ 140} As to whether the indictment was sufficient for defendant to challenge his convictions, we note that in Valentine v. Konteh (6th Cir. 2005), 395 F.3d 62, the Sixth Circuit determined that identical indictments violated the constitution because there were no distinctions made at any time during the trial to differentiate one incident of sexual abuse from another, to link each charge with a specific incident. See Valentine v. Konteh (6th Cir. 2005), 395 F.3d 626.
 {¶ 141} Significantly, the Valentine Court noted that "the forty criminal counts were not anchored to forty distinguishable criminal offenses." The Court *Page 33 
stated:
 {¶ 142} "In its charges and in its evidence before the jury, the prosecution did not attempt to lay out the factual bases of forty separate incidents that took place. Instead, the 8-year-old victim described "typical" abusive behavior by Valentine and then testified that the "typical" abuse occurred twenty or fifteen times."
 {¶ 143} However, the Valentine Court specifically held that:
 {¶ 144} "The due process problems in the indictment might have been cured had the trial court insisted that the prosecution delineate the factual bases for the forty separate incidents either before or during the trial." Id. Accord State v. Rice, Cuyahoga App. No. 82547,2005-Ohio-3393.
 {¶ 145} The Valentine Court also noted:
 {¶ 146} "The deficient charging of the prosecution and the management failure of the trial court, however, should not disturb the verdicts for Count 1 (the first rape count) and Count 21 (the first felonious sexual penetration count) of this case. The prosecutor presented substantial evidence of ongoing abuse, against which Valentine had notice and opportunity to defend. The jury heard the witnesses, evaluated the evidence, and was convinced of Valentine's guilt. Had this case beentried in two counts, the convictions would clearly stand. Thus, anyconstitutional error with regard to the other 38 counts should notrender invalid these two counts." (Emphasis added.).
 {¶ 147} Similarly, in State v. Hemphill, supra, this court stated: *Page 34 
 {¶ 148} "* * * inasmuch as our analysis is governed by the Court's holding in Valentine, supra, we cannot accept the numerical estimate which is unconnected to individual, distinguishable incidents. We therefore find that there is an insufficient factual basis for defendant's convictions on these unspecified offenses. Our further review of the record establishes, however, that a rational trier of fact could have found the essential elements of gross sexual imposition beyond a reasonable doubt, from the first incident (involving defendant's request to get him socks).
 {¶ 149} "We further conclude that a rational trier of fact could have found one offense of rape of the girl prior to her thirteenth birthday, with the furthermore clauses alleging force proven beyond a reasonable doubt. * * *
 {¶ 150} "We further conclude that a rational trier of fact could have found one offense of rape of the girl after her thirteenth birthday, with the furthermore clauses alleging force proven beyond a reasonable doubt. The girl testified that the defendant had sex with her when she went to the basement to sleep."
 {¶ 151} Similarly, in State v. Warren, 168 Ohio App. 3d 288,2006-Ohio-4104, 859 N.E.2d 998,
 {¶ 152} "[W]e cannot accept the numerical estimate which is unconnected to individual, distinguishable incidents." State v.Hemphill, Cuyahoga App. No. 85431, 2005-Ohio-3726, P88. Valentine v.Konteh (6th Cir. 2005), 395 F.3d 626. Accordingly, we will affirm the judgment with respect to the charges as to which we have found sufficient evidence, specifically, four of the counts of gross sexual *Page 35 
imposition, one count of rape, and five counts of kidnapping. The other convictions are reversed."
 {¶ 153} Accord State v. Haverland, Hamilton App. No. C-050119,2005-Ohio-6997, reversed in part on other grounds, In re Ohio CriminalSentencing Statutes Cases, 109 Ohio St.3d 411, 2006-Ohio-2394,848 N.E.2d 809, wherein the court stated:
 {¶ 154} "An indictment and conviction for multiple counts of the same crime without any differentiation may violate a defendant's due-process rights to notice and to not be tried twice for the same crime. But in this case, the state differentiated the counts in the indictment by dates, and the bill of particulars provided other details including the time and location of each offense. Importantly, the state presented evidence of sexual abuse on those dates: Lockwood's testimony that the abuse occurred on Saturdays when he went to work with his uncle, and the Union Central sign-in sheets for the dates specified in the indictment. Because of this differentiation, Haverland has failed to demonstrate a due-process violation."
 {¶ 155} Moreover, we must be mindful that in dealing with an offense against a mentally retarded person, a certain degree of inexactitude in averring the date of the offense is not necessarily fatal to its prosecution. State v. Shepherd, Cuyahoga App. No. 81926, 2003-Ohio-3356. This is especially relevant in this matter as the case proceeded to trial approximately three years after the alleged incidents. *Page 36 
 {¶ 156} In this matter, the evidence indicated that the woman testified to the first incident which occurred after defendant had surgery and testified that when she was getting dressed defendant approached her wearing a towel and then raped her. The evidence also established another incident where defendant had the woman kiss his penis, a white substance came out, and she spit it into the sink. There was also evidence of an incident of vaginal rape which occurred two days before the woman reported the allegations.
 {¶ 157} Moreover, the trial court instructed the jurors that each of the charges constitutes a distinct and separate offense, and that they must consider each count separately. (Tr. 627, 638). In addition, the trial court merged the rape convictions for purposes of sentencing and merged the sexual battery convictions for purposes of sentencing. Thus, defendant was convicted of a single count of rape and a single count of sexual battery. See State v. McGuire, 80 Ohio St.3d 390, 399,1997-Ohio-335, 686 N.E.2d 1112 (noting that a conviction consists of a verdict and a sentence).
 {¶ 158} Finally, the record indicates that the remaining twelve counts of the indictment, upon which the jurors were not able to agree, were later dismissed by the trial court on February 13, 2006.
 {¶ 159} In accordance with all of the foregoing, we find sufficient evidence to support the distinct offenses. This assignment of error is without merit.
 {¶ 160} Defendant's fifteenth assignment of error states: *Page 37 
 {¶ 161} "The trial court committed plain error when it failed to instruct the jury that it must be unanimous in its determination as to the conduct of Mr. Brady that constituted the counts of conviction."
 {¶ 162} Normally, a general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability.State v. Avery (1998), 126 Ohio App. 3d 36, 709 N.E.2d 875. The mere fact that an instruction could conceivably permit a jury to reach a non-unanimous verdict is not sufficient to require reversal when the jury has been instructed that it must reach a unanimous verdict. Id.
 {¶ 163} In this matter, the trial court instructed the jury that they must "consider the evidence with respect to each count separately and make your findings and note them on the verdict forms separately." The court went on to stress that the jury's findings must be unanimous and that it must make findings as to all 24 counts of the indictment. Defendant did not object to the court's instructions. We find no plain error in light of such instructions. See State v. Noling (June 30, 1999), Portage App. No. 96-P-0126.
 {¶ 164} This assignment of error is overruled.
 {¶ 165} Defendant's sixteenth assignment of error states:
 {¶ 166} "Count Nineteen should have been dismissed because it is unconstitutional in its application to consensual sexual conduct between adult stepparents and stepchildren." *Page 38 
 {¶ 167} Defendant next argues that his convictions unconstitutionally infringe upon his right to have sexual relations with persons of his own choosing, even though that person may be a family member.
 {¶ 168} In State v. Benson (1990), 81 Ohio App.3d 697, 612 N.E.2d 337, the court held that R.C. 2907.03(A)(5) was not unconstitutional as applied to a defendant who admitted having sexual intercourse with his seventeen year old stepdaughter, but who claimed that she had initiated it and had seduced him. The court stated:
 {¶ 169} "R.C. 2907.03(A)(5) prohibits incestuous conduct, defining it in broader terms than formerly, so as to include not only sexual conduct by a natural parent with his child, but also sexual conduct by a stepparent with his stepchild, a guardian with his ward, or a custodian or person in loco parentis with his charge. We need hardly cite authority for the obvious conclusion that this statute bears a real and substantial relation to the public morals. We further find that R.C.2907.03(A)(5) is neither unreasonable nor arbitrary. Accordingly, the Act is not facially unconstitutional."
 {¶ 170} This claim therefore lacks merit.
 {¶ 171} Defendant's seventeenth assignment of error states:
 {¶ 172} "Mr. Brady was denied the effective assistance of counsel."
 {¶ 173} In order to establish a claim of ineffective assistance of counsel, the burden is on the defendant to establish that counsel's performance fell below an *Page 39 
objective standard of reasonable representation and prejudiced the defense. Strickland v. Washington (1984), 466 U.S. 668, 80 L.Ed.2d 674,104 S.Ct. 2052. This requires showing: (1) that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment; and (2) that the deficient performance prejudiced the defense.
 {¶ 174} Defendant asserts that his trial counsel was ineffective in connection with various rulings which we have addressed herein and rejected. As we have rejected each of those errors, no error has been shown and the claim of ineffective assistance must fail. See State v.Henderson (1988), 39 Ohio St.3d 24, 33, 528 N.E.2d 1237.
 {¶ 175} This assignment of error is therefore overruled.
Affirmed.
It is ordered that appellee recover from appellant costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. *Page 40 
MELODY J. STEWART, J., CONCURS.
MARY EILEEN KILBANE, P.J., DISSENTS.
[1] It is the policy of this Court to omit the names of child crime victims and adult victims of sexual violence.
[2] R.C. 2744.02(B)(5), R.C. 2151.421 expressly imposes liability for failure to perform the duty to report known or suspected child abuse. *Page 1